# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 08-CR-1324-LRR |
| vs. | **SENTENCING MEMORANDUM** |
| BRENT BEEBE, | |
| Defendant. | |

_____

## I. INTRODUCTION

The matter before the court is the sentencing of Defendant Brent Beebe.

## II. RELEVANT PRIOR PROCEEDINGS

On July 16, 2009, a grand jury returned a 163-count Seventh Superseding Indictment against Defendant and four co-defendants. Count 1 charged Defendant with Conspiracy to Harbor Undocumented Aliens for Profit, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i). Counts 57 through 70 charged Defendant with Harboring Undocumented Aliens for Profit, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), 1324(a)(1)(A)(iv), 1324(a)(1)(A)(v)(II) and 1324(a)(1)(B)(i). Count 71 charged Defendant with Conspiracy to Commit Document Fraud, in violation of 18 U.S.C. § 371.

On January 11, 2010, Defendant appeared before United States Magistrate Judge Jon S. Scoles and pled guilty to Count 71 of the Seventh Superseding Indictment. On January 26, 2010, the undersigned accepted Defendant's guilty plea.

On March 10, 2010, the United States Probation Office ("USPO") released a draft of Defendant's Presentence Investigation Report ("PSIR"). Both parties lodged objections to the draft PSIR.

On April 12, 2010, the USPO prepared a final Presentence Investigation Report PSIR (docket no. 884). On April 22, 2010, the government filed a Sentencing

Memorandum ("Gov. Sent. Memo") (docket no. 900). On April 26, 2010, Defendant filed a Sentencing Memorandum ("Def. Sent. Memo") (docket no. 902). On May 6, 2010, the court held a sentencing hearing ("Hearing"). Assistant United States Peter E. Deegan, Jr. represented the government. Attorney Raphael M. Scheetz represented Defendant, who was personally present. The court reserved ruling on the issues in Defendant's sentencing pending the instant Sentencing Memorandum. On May 26, 2010,, the court shall reconvene the Hearing and impose sentence.

### III. SENTENCING FRAMEWORK

A "district court should begin [a sentencing proceeding] with a correct calculation of the [defendant's] advisory Sentencing Guidelines range." *United States v. Braggs*, 511 F.3d 808, 812 (8th Cir. 2008). A defendant's Guidelines range "is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008).

"[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall v. United States*, 128 S. Ct. 586, 597 (2007)); *see, e.g.*, *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.").

The district court "has substantial latitude to determine how much weight to give the various factors under § 3553(a)." *United States v. Ruelas-Mendez*, 556 F.3d 655, 657 (8th Cir. 2009); *see also United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) ("'[I]t will be the unusual case when we reverse a district court sentence—whether

2

within, above, or below the applicable Guidelines range—as substantively unreasonable.'" (quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)). "If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Braggs*, 511 F.3d at 812 (quoting *Gall*, 128 S. Ct. at 597). "The sentence chosen should be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id.*

## IV. EVIDENTIARY RULES

The court makes findings of fact by a preponderance of the evidence. *See, e.g.*, *United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [Sentencing Guidelines] are applied in an advisory manner."). The court considers a wide variety of evidence, including the undisputed portions of the PSIR, the parties' plea agreement (docket no. 795) as well as the testimony and other evidence the parties introduced at the Hearing. The court does not "put on blinders" and only consider the evidence directly underlying Defendant's offenses of conviction. In calculating Defendant's Guidelines range, for example, the court applies the familiar doctrine of relevant conduct. *See* USSG §1B1.3 (2008). The Eighth Circuit Court of Appeals has repeatedly held that a district court may consider uncharged, dismissed and even acquitted conduct at sentencing. *See, e.g.*, *United States v. Whiting*, 522 F.3d 845, 850 (8th Cir. 2008); *United States v. Bradford*, 499 F.3d 910, 922 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 1446 (2008). When relevant and "accompanied by sufficient indicia of reliability to support the conclusion that it [was] probably accurate," the court credits hearsay. *United States v. Sharpfish*, 408 F.3d 507, 511 (8th Cir. 2005).

## V. STIPULATED FACTS

In the plea agreement, Defendant worked for Agriprocessors, Inc. ("Agriprocessors"). Agriprocessors owned and operated a slaughterhouse and meatpacking plant in Postville, Iowa. Defendant was employed as an Operations Manager. His responsibilities at Agriprocessors included managing the "beef kill" department and generally overseeing beef production at the plant.

On or about May 8, 2008, beef department supervisor Juan Carlos Guerrero-Espinoza met with Defendant to discuss the social security numbers of employees in the beef department. Defendant and Guerrero-Espinoza were aware that a number of employees were working under social security numbers that did not match their identities. Defendant and Guerrero-Espinoza discussed the problem and agreed to help these employees. Defendant requested that Guerrero-Espinoza determine the best way to resolve the problem. Guerrero-Espinoza and another employee in the beef department ("beef employee") met with the employees at issue that same day.

After the meeting, Guerrero-Espinoza reported to Defendant that the employees needed approximately $4,500 to resolve the social security problem by obtaining new fraudulent identification documents. Defendant knew that this money would aid approximately nineteen employees.

Later that day, Defendant and Guerrero-Espinoza met with Agriprocessors' vice president, co-defendant Sholom Rubashkin. Defendant and Guerrero-Espinoza told Rubashkin that they needed $4,500 to procure fraudulent identification documents for employees in the beef department. Rubashkin agreed to loan the money to these employees. Rubashkin suggested that Defendant and Guerrero-Espinoza should consider providing assistance to other employees. Defendant refused to provide any further assistance.

On May 9, 2008, Guerrero-Espinoza met with the beef employee and other employees in the beef department. The employees provided money, photographs, false names, and birth dates to the beef employee to enable the beef employee to obtain new false identification documents. Guerrero-Espinoza loaned a portion of the $4,500 to the employees.

That same date, Rubashkin asked Agriprocessors Human Resources employee, Laura Althouse, to report to work on May 11, 2008 to process new employee and applicant paperwork. On or about May 10 and 11, 2008, the beef employee obtained false documents for a number of Agriprocessors employees under Guerrero-Espinoza's supervision, as well as other Agriprocessors employees.

On May 11, 2008, Rubashkin inspected the new fraudulent documents Guerrero-Espinoza had procured and indicated that Agriprocessors should hire the individuals who possessed these new identification documents. Althouse assisted the employees in completing application paperwork for these employees, even though she knew that the identification documents were fraudulent. Guerrero-Espinoza assisted. Defendant copied blank employment packets and delivered them to the Human Resources Department.

## IV. CONTESTED GUIDELINES ISSUES

The parties agree that Defendant's Base Offense Level is **11** pursuant to USSG §2L2.1. The parties also agree that a three-level reduction pursuant to USSG §2L2.1(b)(1) applies, which brings Defendant's Base Offense Level to **8**. Defendant's sentencing involves two contested issues: (1) whether a nine-level upward adjustment pursuant to USSG §2L2.1(b)(2)(C) for 100 or more documents applies; and (2) whether a three-level upward adjustment pursuant to USSG §3B1.1(b) for role enhancement applies. The parties agree that the final offense level should be reduced by two levels for acceptance of responsibility, pursuant to USSG §3E1.1(b).

## A. Number of Documents

Section 2L2.1(b)(2) provides that the court shall increase Defendant's Base Offense Level by **9** if the offense involved 100 or more documents or passports. USSG §2L2.1(b)(2) The government contends that this enhancement applies, because "it was foreseeable that 100 or more unlawful aliens were employed at Agriprocessors, Inc. in Postville, under fake documents." Gov. Sent. Memo at 7. Further, the government states that, "[b]y endeavoring to obtain new, fake identification documents for several beef employees under his supervision, [D]efendant affirmatively joined in the 'common scheme or plan' and, thereby, became responsible for all the undocumented aliens[.]" *Id.* at 4. Essentially, the government urges the court to adopt a conspiracy theory of liability in its consideration of this enhancement.

Defendant concedes that the offense involved 6 to 24 documents or passports, and that his base offense level should be increased by **3** levels. USSG §2L2.1(a)(2)(A). Defendant states that he "agreed to jointly undertake obtaining a loan for the [nineteen] undocumented employees that worked on the beef side, [but that he] affirmatively declined to expand his criminal conduct when invited to do so by [Rubashkin]." Def. Sent. Memo at 6.

In ascertaining the amount of documents involved in the offense, the court looks to the doctrine of relevant conduct. This doctrine is described in USSG §1B1.3. "The Guidelines include as relevant conduct in the case of a jointly undertaken criminal activity all (1) 'reasonably foreseeable acts and omissions of others' (2) 'in furtherance of' (3) 'the jointly undertaken criminal activity.'" *United States v. Spotted Elk*, 548 F.3d 641, 673 (8th Cir. 2008) (quoting USSG §1B1.3(a)(1)(B)). Although these elements closely mirror the requirements for conspiracy liability, "the commentary to USSG §1B1.3 explains that the concepts of relevant conduct under the Guidelines, on the one hand, and conspiracy liability, on the other, are not the same[.]" *Id.* The commentary "shows that while the

emphasis in substantive conspiracy liability is the scope of the *entire conspiracy* and foreseeability in light of that scope, the emphasis under §1B1.3 is the scope of the *individual defendant's* undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole[.]" *Id.* at 673-74 (emphasis in the original).

In this case, Defendant undertook to aid approximately nineteen individuals in obtaining fraudulent documents. In light of that undertaking, it was reasonably foreseeable to Defendant that nineteen individuals would receive fake documents. Defendant's conduct was limited to those nineteen documents. There is no evidence that Defendant's undertaking and foreseeability extended beyond these nineteen individuals. Indeed, Defendant expressly declined to assist additional employees in obtaining new false documents even though his boss suggested that he do so. When Rubashkin asked Defendant to aid additional individuals seeking employment identification documents, Defendant refused to participate. Accordingly, the court finds that the government failed to prove by a preponderance of the evidence that Defendant's offense involved 100 or more documents. The court finds that the offense involved 6 to 24 documents and thus, Defendant's base offense level should be increased by **3** levels. USSG §2L2.1(a)(2)(A). This brings Defendants base offense level to **11**.

### B. Role in the Offense

USSG §3B1.1(b) provides that, "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels." The government argues that the USPO properly scored this enhancement.

In assessing whether to apply this enhancement, the court should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal

7

> activity, and the degree of control and authority exercised over others.

USSG §3B1.1(b) cmt. (n.4). "In the document fraud context, the Eighth Circuit Court of Appeals held that a defendant was entitled to a three-level increase because 'she was one of the core members of the conspiracy and chiefly responsible for the manufacture and distribution of many of the fraudulent documents.'" *United States v. Elmardoudi*, 611 F. Supp. 2d 879, 894 (N.D. Iowa 2008) (Reade, C.J.) (quoting *United States v. Telemaque*, 934 F.2d 169, 171 (8th Cir. 1991)).

The court declines to apply the three-level enhancement. The court agrees with Defendant that, "[a]lthough [he] was a supervisor of Guererro-Espinoza within the beef division at Agriprocessors, it does not follow that he was a supervisor for obtaining the fake documents." Def. Sent. Memo at 8. The evidence cited by the government in support of its argument for the enhancement is more reflective of Defendant's role as a supervisor at the plant—not as a supervisor of the illegal activity. For instance, the government argues that Defendant "instructed Guerrero-Espinoza that the employees 'should remain at the same pay level' after being rehired under their new identities." Gov. Sent. Memo at 8. The court agrees with Defendant that he made this instruction in the scope of his employment, not in the scope of the illegal activity.

Defendant was not "one of the core members of the conspiracy." *Telemaque*, 934 F.2d at 171. He was not "chiefly responsible for the manufacture and distribution of many of the fraudulent documents." *Id.* Defendant simply obtained a loan to buy documents and made copies of blank application forms. He did not exercise significant decision-making with respect to the conspiracy, nor did he recruit accomplices or claim a larger fruit of the crime than others. USSG §3B1.1(b) cmt. (n.4). Accordingly, the court declines to apply the role enhancement.

## *VI. CALCULATION OF ADVISORY SENTENCING GUIDELINES RANGE*

After all the applicable adjustments, Defendant's adjusted offense level is **9**. Defendant is **Criminal History Category I**. His advisory guidelines range, prior to any departure or variance, is **4 to 10 months of imprisonment**.

## *VII. CONCLUSION*

When the Hearing resumes, the court shall sentence Defendant in a matter consistent with the instant Sentencing Memorandum. On May 26, 2010, at 10:00 a.m., the court shall reconvene the Hearing and impose sentence.

**IT IS SO ORDERED.**

**DATED** this 24th day of May, 2010.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA